---

**SO ORDERED,**



*Judge Selene D. Maddox*

**United States Bankruptcy Judge**

The Order of the Court is set forth below. The case docket reflects the date entered.

---

## UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF MISSISSIPPI

| | | |
|---|---|---|
| **IN RE:** | **MEDEX, LLC** | **CASE NO. 24-11781-SDM** |
| | **DEBTOR** | **CHAPTER 11** |

## MEMORANDUM OPINION AND ORDER DENYING WITHOUT PREJUDICE DEBTOR'S MOTION FOR AUTHORITY TO USE PROPERTY OF THE ESTATE

This matter came before the Court on MedEx, LLC's *Motion for Authority to Use Property of the Estate* (the "Motion") [Dkt. #166]. RedMed, LLC and Covenant Investment Series II, Inc. filed an objection to the Motion [Dkt. #182]. Karol B. Turner and M&K Equipment Rentals, LLC filed a joinder in the objection [Dkt. #183]. John Logan filed a joinder in support of the Motion and a reply to the objections [Dkt. #184]. The Court conducted an evidentiary hearing on May 11, 2026 and heard closing arguments on May 14, 2026.

The issue before the Court is whether MedEx, as debtor-in-possession, may use approximately $227,000 in funds held by Debtor's counsel to finance a proposed operational expansion involving MedEx and three affiliated MedPlus urgent care clinics. MedEx contends that the proposed use is a sound exercise of business judgment because MedEx's revenue depends on management fees generated from those clinics. The objecting parties contend that the Motion would use property of the MedEx estate to fund separate affiliated entities without sufficient proof of direct estate benefit or adequate safeguards.

To be clear, the Court does not hold that a management company debtor can never use estate property in a way that indirectly benefits managed affiliates. Nor does the Court hold that MedEx's business theory is implausible. MedEx presented evidence that its management-fee revenue is tied to the success of the clinics it manages, and that increased clinic revenue may increase MedEx's revenue. The Motion as filed, however, including the evidentiary support, asks the Court to authorize the use of substantially all available liquid funds for a speculative, affiliate-centered business expansion without sufficient documentation, repayment structure, contractual protection, or plan-level safeguards.

Section 363(b)[1] does not require guaranteed success or certainty of future profitability. Nevertheless, it does require more than optimistic projections unsupported by enforceable protections, reliable financial structure, or concrete mechanisms ensuring that projected benefits will inure to the estate. Because MedEx has not established the threshold predicate that the funds may be used under § 363(b), and because the proposed use is not otherwise supported by sufficient proof, structure, and estate-level protections, the Motion is denied without prejudice.

## I. JURISDICTION

The Court has jurisdiction over this contested matter under 28 U.S.C. §§ 1334 and 157. This matter is a core proceeding under 28 U.S.C. § 157(b)(2)(A), (M), and (O) because it concerns administration of the estate and the proposed use of property of the estate. Venue is proper.

## II. BACKGROUND

MedEx filed this Subchapter V Chapter 11 case on June 21, 2024. MedEx is a Mississippi limited liability company. John Logan testified that he is the owner and manager of MedEx. MedEx

---

[1] All statutory references will be to Title 11 of the United States Code unless indicated otherwise.

does not operate an urgent care clinic in its own name. Rather, MedEx's business model is built around providing management services to related urgent care clinic entities.

At the hearing, John Logan testified that MedEx manages MedPlus Urgent Clinic, LLC ("MedPlus Tupelo"), MedPlus Starkville, LLC ("MedPlus Starkville"), and MedPlus New Albany, LLC ("MedPlus New Albany"). MedPlus Tupelo is a debtor in a separate bankruptcy case pending before this Court. MedPlus Starkville and MedPlus New Albany are not debtors in bankruptcy. John Logan testified that his wife, Samantha Logan, owns the MedPlus clinic entities.

The funds at issue originated from a $250,000 check related to state-court litigation. The record contains some uncertainty regarding the source and ultimate ownership of the funds. John Logan testified that although the funds were returned to MedEx and are being held for MedEx, he believes the funds were originally his because he borrowed against life insurance policies and used personal funds to place money into the MedEx account before the payment was made in the state-court matter. John Logan also testified that MedEx has control of the funds. The Court does not decide ultimate ownership of those funds in this Opinion. Because MedEx seeks authority to use the funds under § 363(b), MedEx was required to establish that the funds are property of the estate or otherwise subject to use by MedEx under § 363(b). The unresolved record concerning ownership and control of the funds is therefore relevant to the Court's analysis and to the denial without prejudice.

Attached to the Motion is a document titled "Presentation to United States Bankruptcy Court to Request Release of Funds: Investment in Three New Service Improvements for MedPlus Clinics" (the "Presentation"). Ex. 1. John Logan testified that he prepared the proposal himself, and the Court admitted the Motion and its attachment in evidence. The Presentation proposes using approximately $227,000 to fund several operational initiatives involving MedPlus Tupelo,

MedPlus Starkville, and MedPlus New Albany including: rural health clinic conversion consulting, functional medicine and longevity training, urgent care and telemedicine training, equipment purchases, marketing efforts, management and leadership conference travel, and a reserve for legal services.[2]

MedEx contends that the expenditures are necessary to increase patient volume, expand services, and improve clinic revenue. John Logan testified that urgent care clinics have experienced declining patient volumes since the COVID-19 pandemic and that the clinics must expand services and improve marketing to remain viable. He further testified that MedEx researched telemedicine opportunities, rural health clinic conversion, functional medicine, longevity services, and marketing strategies to increase clinic performance and revenue. John Logan also testified that MedEx had discussed a potential telemedicine arrangement with a third-party provider and had exchanged proposed contract terms, but no executed agreement was introduced into evidence.

The Presentation projects approximately $879,720 in additional annual new revenue across the three clinics once the proposed initiatives mature, including projected revenue associated with telemedicine services and expanded marketing efforts. The Presentation attributes approximately $211,200 of that projected annual revenue to MedPlus Tupelo, $354,760 to MedPlus Starkville, and $313,760 to MedPlus New Albany. The Presentation further projects that MedEx would indirectly benefit through increased management-fee revenue tied to clinic performance over a multi-year period. The Presentation assumes that MedEx would receive management fees at a reduced 7.5% rate during the initial implementation period and at a 12% rate in later years if the

---

[2] The record also reflects that the amount remaining in the Debtor's counsel's account was less than the full $227,000 requested by the Motion. Mr. Logan testified that he would personally cover any shortfall if the proposed expenditures exceeded the available funds.

clinic operations improved sufficiently to support the increased fee structure. John Logan likewise testified that MedEx's management fee rate had been temporarily reduced to 7.5% but would return to 12% in later years if the clinics could sustain that level. The Presentation also included projected implementation timelines, projected management-fee revenue, and internally prepared cash-flow projections extending into 2029.

The objecting parties challenged several aspects of the Motion. First, they argued that the Motion seeks to use MedEx funds to support separate legal entities, including two non-debtors and one separate debtor. Second, they argued that the projected benefit to MedEx is speculative and delayed. Third, they argued that the Motion lacks ordinary protections, such as promissory notes, interest, collateral, maturity dates, repayment terms, reimbursement obligations, or default remedies. Fourth, they questioned whether MedEx currently has a management relationship with MedPlus Tupelo.

Another issue arose because John Logan previously testified that MedEx no longer provided management services to MedPlus Tupelo and that MedPlus Tupelo was paying him personally. At the hearing on the Motion, John Logan testified that his prior statements were poorly worded or reflected a misunderstanding regarding payment flow. He maintained that MedEx remained the manager of MedPlus Tupelo, even though MedPlus Tupelo paid him directly for a period of time. Finally, counsel for John Logan challenged the standing of RedMed, Covenant, Turner, and M&K. He argued that their proofs of claim are false or unsupported by valid state-law claims and asked the Court to strike or overrule their objections. The Court addresses that issue below only to the extent necessary to decide the Motion. The Court now turns to whether the Motion satisfies § 363(b).

## III. DISCUSSION

The Motion requires more than a determination of whether MedEx has articulated a plausible business rationale for the proposed expenditures. It also requires consideration of whether the anticipated benefits to the estate are sufficiently concrete and supported by the evidence, whether the proposed use adequately protects the estate's interests, and whether the requested relief is appropriate in light of the current posture of this Chapter 11 case. These issues are considered in turn below.

**A.  Section 363(b) allows a debtor-in-possession to use estate property outside the ordinary course only when the proposed use is supported by sufficient business justification.**

A debtor-in-possession has broad authority to operate its business. Section 1108 provides that, unless the court orders otherwise, a trustee may operate the debtor's business. 11 U.S.C. § 1108. Section 1107 gives a debtor-in-possession the rights, powers, and duties of a trustee. 11 U.S.C. § 1107(a). Even so, that authority does not mean a debtor may use estate property outside the ordinary course without court approval. Section 363(b)(1) provides that a trustee, "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1).[3] Section 363(b) concerns property of the estate, and § 541 defines what constitutes property of the estate. *In re Cont'l Air Lines, Inc.*, 780 F.2d 1223, 1226 (5th Cir. 1986). Thus, the asset proposed to be used must be estate property. *Id.*

The Fifth Circuit has repeatedly recognized that § 363(b) contains an implicit business-justification requirement. In *Continental*, the Fifth Circuit explained that, for a "debtor-in-

---

[3] The parties do not seriously dispute that the proposed use is outside the ordinary course. The Motion seeks authority to use approximately $227,000 for a new business expansion strategy involving MedEx and related clinics. The expenditures include training, marketing, consulting, equipment, conference travel, and legal reserves. This is not a routine monthly expense. It is not a normal recurring payment made in the ordinary operation of MedEx's business. It is a substantial deployment of available funds into a new or expanded business strategy. The Motion, therefore, must satisfy § 363(b).

possession to satisfy its fiduciary duty to the debtor, creditors, and equity holders, there must be some articulated business justification for using, selling, or leasing property outside the ordinary course of business." *Id*. (internal citations omitted). Whether the business justification is sufficient depends on the particular case. *Id*.[4]

The same general principle appears in later Fifth Circuit authority. In *Moore*, the Fifth Circuit reiterated that courts may approve § 363(b) transactions when supported by an articulated business justification, good business judgment, or sound business reason. *In re Moore*, 608 F.3d 253, 263 (5th Cir. 2010). In *ASARCO*, the Fifth Circuit likewise recognized the need for business justification in the use or disposition of estate property outside the ordinary course. *In re ASARCO, L.L.C.*, 650 F.3d 593, 601 (5th Cir. 2011).

The standard is deferential, but it is not automatic. A debtor-in-possession holds its powers in trust for the benefit of creditors. *Matter of Hughes*, 704 F.2d 820, 822 (5th Cir. 1983). The Court does not substitute its own business judgment for the debtor's business judgment. The Court must determine whether the debtor's proposed use of estate property is informed, made in good faith, reasonably calculated to benefit the estate, and consistent with the Bankruptcy Code. See *Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F.2d 1303, 1309 (5th Cir. 1985) (explaining that court approval should be withheld where the debtor's business judgment is "clearly erroneous, too speculative, or contrary to the provisions of the Bankruptcy Code").[5]

---

[4] As the party seeking authority to use estate property outside the ordinary course, MedEx bears the initial burden of establishing a sufficient business justification supported by the evidentiary record. The Court need not determine whether the objecting parties rebutted a presumption of valid business judgment because, as explained below, MedEx has not made a sufficient showing.

[5] The Debtor also cited *In re Johns*, 667 B.R. 322 (Bankr. N.D. Tex. 2025) in closing argument. *Johns* involved approval of a trustee's proposed settlement and sale under § 363 and Federal Rule of Bankruptcy Procedure 9019. *Id*. at 323-24. *Johns* reiterates the deferential nature of the business-judgment standard and the trustee's duty to maximize estate value. *Id*. at 325-26.

*Continental* provides helpful guidance for this case. There, Continental Air Lines sought authority to enter into long-term postpetition aircraft leases. 780 F.2d at 1224-25. Continental argued that the aircraft were necessary to preserve valuable Pacific route authority and improve profitability and cash flow. *Id*. at 1225. The Fifth Circuit held that the bankruptcy court could consider business justifications such as preservation of route systems, competitive advantage, and future cash flow. *Id.* at 1227. The Fifth Circuit also emphasized that the bankruptcy court must consider all salient factors, including the proportionate value of the asset to the estate, the amount of elapsed time since filing, the likelihood that a plan will be proposed and confirmed, the effect of the proposed transaction on reorganization, the alternatives, and whether the asset is increasing or decreasing in value. *Id*. at 1226 (quoting *In re Lionel Corp.*, 722 F.2d 1063, 1071 (2d Cir. 1983)). Those factors are not a rigid checklist. They are guideposts for evaluating whether the proposed use of estate property falls within the proper scope of § 363(b).

Courts have approved complex and atypical transactions under § 363(b) when supported by a sufficiently developed evidentiary record demonstrating concrete benefit to the estate. In *Royal Alice*, for example, the bankruptcy court approved a proposed settlement and sale structure after the Chapter 11 trustee presented evidence concerning valuation, lease economics, marketing strategy, creditor protections, carve-outs, and anticipated estate recovery. *In re Royal Alice Properties, LLC*, 637 B.R. 465, 472-75, 480, 486-87 (Bankr. E.D. La. 2021). The trustee also testified regarding the expected economic benefit to the estate and the reasons the proposed structure would maximize value for creditors. *Id*. at 474-75.

---

The Court does not disagree with those principles. *Johns* involved a trustee-supported settlement and sale process accompanied by competing bids, litigation settlement considerations, and an evidentiary record materially different from the operational expansion proposal presently before the Court.

Here, the Court does not hold that a debtor may never pursue an operational restructuring strategy involving affiliated entities. The Court merely holds that where estate assets are proposed to be used for affiliated-centered expansion efforts, the debtor must still provide sufficient evidence and structural protections demonstrating that the proposed use is reasonably calculated to benefit and protect the estate itself.

**B. MedEx did not establish that the funds are property of the estate or otherwise subject to use under § 363(b).**

The parties devoted some testimony and argument to the source and ownership of the funds. John Logan testified that he believes the funds are his because they originated from personal sources, including life insurance loans and personal cash. He also testified, however, that the funds were returned to MedEx, are held by Debtor's counsel, and are under MedEx's control. MedEx's monthly operating reports also reflect the funds in connection with MedEx.

While the Court does not need to finally adjudicate ownership of the funds to deny the Motion, the Court could not grant relief under § 363(b) unless MedEx first established that the funds are property of the estate or otherwise subject to use by MedEx under § 363(b). Section 363(b) authorizes use of property of the estate. If the funds belong to John Logan or another non-debtor, § 363(b) is not the proper vehicle to authorize their use. If the funds belong to MedEx's estate, MedEx still must satisfy the business-justification and estate-protection requirements discussed below.

The record does not sufficiently resolve that threshold issue. John Logan's testimony and the monthly operating reports reflect competing characterizations of the funds. The evidence shows that the funds are being held by Debtor's counsel and are connected to MedEx, but the record also includes testimony that the funds originated from personal sources and may belong to John Logan. Based on the evidence, the Court will not approve the use of funds under § 363(b)

without a clearer evidentiary showing that the funds are property of the estate or otherwise subject to use by MedEx under the Bankruptcy Code.

This ruling does not decide ownership of the funds. It means only that the unresolved record concerning ownership and control is an additional reason the Motion cannot be granted as filed. Any renewed motion should be supported by evidence addressing the source, ownership, control, and estate-property status of the funds.

**C. MedEx articulated a plausible business rationale, but a plausible rationale is not enough when the use directly benefits separate affiliated entities.**

MedEx's theory is not frivolous. MedEx is a management company, and its business depends on management-fee revenue. If the clinics manage to increase revenue, MedEx may receive increased management fees. John Logan testified that patient volumes have declined, that urgent care clinics face financial pressure, and that the clinics need new services and improved marketing to survive. He also testified that MedEx researched telemedicine opportunities, rural health clinic conversion, functional medicine, longevity services, and marketing strategies. That testimony provides an articulated business rationale. Even so, the Court must determine whether the rationale is sufficient under the particular facts of the case.

The difficulty is that the proposed expenditures directly benefit separate affiliated entities. MedEx is not simply buying equipment for itself, paying its own employees, or funding its own direct operations. The proposal contemplates spending funds for training, services, marketing, and related costs tied to MedPlus Tupelo, MedPlus Starkville, and MedPlus New Albany. Those entities are separate legal entities. Two are non-debtors, and one is a separate debtor in a separate case.

Indeed, affiliate transactions are not prohibited in Chapter 11. A debtor may have legitimate business reasons to transact with affiliates. But a debtor-in-possession's fiduciary duties run to the

estate and creditors, not to nondebtor affiliates or to an integrated business group generally. See e.g., *Continental*, 780 F.2d at 1226 ("[F]or the debtor-in-possession or trustee to satisfy its fiduciary duty to the debtor, creditors and equity holders, there must be some articulated business justification for using, selling, or leasing the property outside the ordinary course of business."); *Matter of Hughes*, 704 F.2d at 822 (explaining a debtor-in-possession holds its powers in trust for the benefit of creditors, who may require the debtor-in-possession to exercise those powers for their benefit); *In re Crutcher Res. Corp.*, 72 B.R. 628, 632 (Bankr. N.D. Tex. 1987) (emphasizing that affiliated Chapter 11 cases must be administered for the benefit of the individual debtor estates and their creditors, rather than for the benefit of the parent corporation). This is where the present record is insufficient. MedEx's projected benefit is indirect. The clinics receive the direct operational benefit. MedEx receives a benefit only if the expenditures increase clinic revenue and only if MedEx has enforceable rights to collect management fees from that increased revenue.

The absence of documentation is particularly important as to MedPlus Tupelo. The record contains prior testimony suggesting that MedEx no longer provided management services to MedPlus Tupelo and that MedPlus Tupelo paid John Logan personally. John Logan explained at the hearing that this was a misunderstanding concerning payment flow. The Court does not find bad faith, but the inconsistency illustrates why the Court cannot approve use of estate property based primarily on oral assurances about affiliate relationships. The record should contain the written management agreement, any amendments, the precise management fee terms, and the contractual basis for MedEx to recover or benefit from the proposed expenditures.

The same concern applies to MedPlus Starkville and MedPlus New Albany. John Logan testified that MedEx manages those entities and that they pay MedEx management fees. The Motion does not, however, establish whether MedEx is contractually obligated to fund their

training, marketing, equipment, RHC conversion, or related business expansion. Nor does the Motion establish whether MedEx is entitled to reimbursement, an increased management fee, a lien, an assignment of revenue, or some other enforceable return.

MedEx may be correct that what benefits the clinics ultimately benefits MedEx. But § 363(b) requires more than an enterprise-level hope that related entities will all do better together. It requires sufficient showing that the Debtor's estate is receiving a justified and protected benefit.

**D. The evidentiary record is too thin to support the requested use of substantially all available liquid funds.**

The Court does not require certainty, and business judgment often involves risk. Nevertheless, the level of proof required depends on the nature and magnitude of the requested transaction. Here, MedEx seeks to use substantially all available liquid funds to support a multi-year operational strategy centered on affiliated entities. That request requires a developed evidentiary record and meaningful estate-level protections.

Courts approving substantial § 363(b) transactions typically rely upon evidence demonstrating both operational necessity and a concrete benefit to the debtor's estate. In *Condere Corp.*, for example, the bankruptcy court approved a substantial preconfirmation transaction only after extensive evidence regarding deteriorating operations, capital needs, failed restructuring efforts, creditor negotiations, market conditions, operational performance, and the absence of alternative purchasers. *In re Condere Corp.,* 228 B.R. 615, 628-30 (Bankr. S.D. Miss. 1998).

*Raytech Corp.*, likewise, illustrates the type of developed record and transaction structure that can support a significant § 363(b) use of estate property for future business growth. *In re Raytech Corp.*, 190 B.R. 149 (Bankr. D. Conn. 1995). In *Raytech*, the debtor sought authority to use estate assets through a wholly owned subsidiary to acquire another company as part of a long-term rehabilitation strategy. *Id*. at 150, 152. The court did not merely rely on management

optimism, but on evidence of actual erosion of market share, loss of business opportunities, operational data tied to the debtor's existing business, anticipated synergies and economies of scale, structured acquisition terms, due diligence protections, contingent board approval, and pricing mechanisms tied to future performance. *Id.* at 152–53. *Raytech* is not binding on this Court, and the facts are different. The case is instructive because it illustrates the type of evidentiary development and transactional protections courts often rely upon when approving substantial § 363(b) transactions involving long-term operational strategy.

Other courts applying Fifth Circuit law have similarly denied substantial § 363(b) requests where the evidentiary record did not sufficiently demonstrate concrete estate benefit or adequate protection of estate interests in the context of affiliate-centered transactions. In *Crutcher*, the bankruptcy court denied a proposed transaction involving affiliated debtors where the court found insufficient evidence regarding value, estate benefit, and the effect on subsidiary creditors. *In re Crutcher Res. Corp.*, 72 B.R. 628, 630, 632-33 (Bankr. N.D. Tex. 1987). The court emphasized the need to evaluate the proposed transaction from the standpoint of the particular debtor estates and their creditors rather than solely from the perspective of preserving the broader affiliated enterprise. *Id*. at 633.

While these cases are not factually identical to the dispute, together they illustrate an important principle: courts evaluating substantial § 363(b) transactions generally require more than internal projections and generalized business optimism. They require developed evidence connecting the proposed use to the debtor's own operations and protections reasonably designed to ensure that the debtor's estate receives the anticipated benefit.

The record here is much thinner. As discussed above, the projections and cash-flow estimates contained in the Presentation were prepared internally by John Logan. No expert

testimony was presented, and no independent financial analysis, market study, or third-party validation of the projections was introduced. No signed telemedicine contract or RHC conversion agreement was introduced. No vendor contracts were introduced in a form sufficient to bind the parties. No management fee amendments, promissory notes, repayment agreements, security agreements, assignments of receivables, or other protections were offered to ensure that MedEx itself receives the projected benefit of the proposed expenditure.

The Court does not require certainty of success or sale-process-level proof before approving a § 363(b) transaction. But where a debtor seeks authority to deploy substantially all available liquid assets into a multi-year affiliate-centered operational strategy supported primarily by internally generated projections and generalized operational forecasts, § 363(b) requires a more developed evidentiary showing than the present record provides.

MedEx argues that doing nothing may be worse. That may be true, but the alternatives are not limited to either unconditional approval of this Motion or business failure. MedEx could seek narrower or phased relief, document repayment obligations, provide enforceable contractual protections, seek coordinated relief in the MedPlus Tupelo case, or present a renewed request supported by reporting mechanisms, oversight protections, or plan integration. Based on the evidence presented, however, the Court cannot conclude that the requested use satisfies § 363(b).

**E. The proposed use lacks ordinary safeguards for an affiliate-centered transaction.**

If the proposed expenditures are truly MedEx's own operational expenses under enforceable management agreements, the record does not sufficiently establish the scope of those contractual obligations or MedEx's enforceable right to receive the projected benefit of the expenditures. If, instead, the proposed expenditures function as advances or investments for the

benefit of affiliated clinics, the proposed transaction lacks the protections ordinarily associated with such arrangements.

There are no promissory notes, repayment agreements, interest provisions, maturity dates, assignment of receivables, default remedies, reporting obligations, or other mechanisms designed to protect the MedEx estate if the projected revenue increases do not materialize. Nor is there evidence that MedPlus Tupelo, as a separate debtor, has obtained authority in its own bankruptcy case to incur any corresponding obligation to MedEx. There is no enforceable mechanism ensuring that any increased clinic revenue would actually flow back to MedEx rather than remain with the clinics, insiders, or other obligations.

Those omissions are significant because they leave the Court unable to determine whether the proposed use reasonably protects the MedEx estate against the risks associated with the transaction. Section 363(b) does not require elimination of risk, and the Court does not hold that every affiliate-related transaction must resemble a conventional lending agreement. The absence of ordinary transactional safeguards, however, becomes particularly significant where a debtor seeks authority to commit substantial estate funds to a speculative operational strategy centered on affiliated entities and dependent on uncertain future returns. See *Crutcher Res. Corp.*, 72 B.R. at 632-33.

These concerns are compounded by the unresolved uncertainty regarding the source and ownership of the funds themselves. John Logan testified that he believes the funds originated from personal sources, including life-insurance loans and personal funds, while also maintaining that the funds are held for and controlled by MedEx. The Court need not finally adjudicate ownership to deny the Motion, but because § 363(b) authorizes the use of estate property, the unresolved record concerning ownership and control of the funds provides an independent reason why the

Motion cannot be granted as filed. That uncertainty further underscores the need for clear documentation, enforceable structure, and estate-level protections before approval under § 363(b).[6]

The Court also notes that some categories of the proposed budget appear more directly tied to the asserted revenue-producing strategy than others. RHC conversion consulting, telemedicine training, and limited equipment may bear a closer relationship to the projected operational improvements. Conference travel, broad marketing initiatives, functional medicine training, and a legal reserve are more attenuated from the specific projected revenue increases and present additional concern. Professional fees must be handled through the compensation procedures required by the Bankruptcy Code and Rules, and insider travel and conference expenses warrant caution.

This does not mean such expenditures could never be justified. Marketing expenses, training initiatives, and professional services may all serve legitimate business purposes in an appropriate case. Even so, the present record does not sufficiently identify the vendors, contractual terms, scope of services, duration, expected return, or method of measuring results. Nor does the Motion meaningfully distinguish between expenditures intended to benefit MedEx itself and expenditures primarily benefiting affiliated clinic operations. Instead, the Motion aggregates all categories into a single request seeking authority to expend substantially all available liquid funds. Under these circumstances, § 363(b) requires a more particularized showing than the present record provides.

---

[6] For the sake of thoroughness, the Court notes that even where a debtor establishes a sufficient business justification under § 363(b), the proposed use of estate property remains subject to the additional requirements of § 363. See 11 U.S.C. § 363(d)-(e); *Cont'l Air Lines, Inc.*, 780 F.2d at 1226. Here, the objectors do not argue that the proposed use is inconsistent with any relief granted under § 362 (c)-(f). See 11 U.S.C. § 363(d). Further, no party formally requested adequate protection under § 363(e), and the Motion was not presented as a request to use cash collateral or obtain postpetition financing.

**F. Going-concern value does not eliminate the need for estate-level proof and protections.**

MedEx argues that the proposed use is necessary to preserve or enhance its going-concern value. The Court does not discount that objective. Preservation of going-concern value is often a central goal of Chapter 11, and a debtor may appropriately incur operational expenses before confirmation in an effort to stabilize or preserve enterprise value. The Court also recognizes John Logan's testimony that MedEx's viability depends heavily upon the continued operation and success of the clinics it manages.

Still, preservation of going-concern value does not eliminate the need for proof that the proposed use will produce a concrete and protectable benefit for the MedEx estate itself. Nor does it permit the Court to disregard the separateness of the affiliated entities involved here. The present record does not sufficiently establish enforceable contractual rights, operational controls, revenue structures, or other protections demonstrating that the projected future benefits of the proposed expenditures would flow back to MedEx in a concrete and protectable manner for the benefit of its estate and creditors.

MedEx also relies upon concepts drawn from postpetition financing and cash collateral practice, including counsel's discussion of the DIP financing and cash collateral orders entered in *In re Prospect Med. Holdings, Inc.*, No. 25-80002-SGJ-11, Final Order (I) Authorizing Postpetition Financing and Use of Cash Collateral and Granting Related Relief, ECF No. 668, at 1–10 (Bankr. N.D. Tex. Feb. 14, 2025). The Court understands the proposed analogy. In an appropriate case, preservation of going-concern value may support financing or cash-collateral relief designed to stabilize operations and preserve enterprise value. Even assuming *Prospect Medical* is persuasive, it is materially different.

*Prospect Medical* involved a formal DIP financing and cash collateral structure supported by detailed budgets, approved financing terms, reporting requirements, operational covenants, milestones, priming liens, superpriority claims, lender remedies, and negotiated adequate protection provisions. *Id*. at 1-10. This Motion is not a DIP financing motion or cash collateral motion. MedEx instead seeks authority to deploy substantially all available liquid funds into a multi-year operational strategy benefiting affiliated entities, two of which are nondebtors, without procedural safeguards or sufficiently developed evidentiary record establishing how the MedEx estate itself will be protected if the projected operational improvements and revenue increases do not materialize.

The Court, therefore, does not reject preservation of going-concern value as a legitimate restructuring objective. The Court concludes only that MedEx has not shown, on the present record, that the proposed use will preserve or enhance MedEx's going-concern value in a sufficiently concrete, measurable, and protected manner to justify approval under § 363(b).

## G. MedEx's fiduciary obligations run to the estate and creditors, not merely to the integrated business enterprise.

The record shows that MedEx and the MedPlus clinics are closely related. John Logan owns MedEx. Samantha Logan owns the MedPlus clinic entities. The entities appear to operate cooperatively. John Logan views them as part of an integrated business enterprise. The Court does not doubt that reality. The Bankruptcy Code generally respects separate legal entities unless substantive consolidation, veil piercing, or another recognized doctrine applies. No such relief is before the Court. The Court is not being asked to substantively consolidate MedEx with MedPlus Tupelo, MedPlus Starkville, or MedPlus New Albany. Nor has MedEx established that the entities should be treated as one debtor for purposes of using estate property.

That distinction is important. A transaction that benefits the overall Logan-related enterprise may or may not benefit the MedEx estate. Courts evaluating affiliate centered § 363(b) transactions have recognized that preservation of an integrated business enterprise does not alone establish sufficient benefit to the particular debtor's estate whose assets are being deployed. See, e.g., *Crutcher Res. Corp.*, 72 B.R. 632-33 (denying proposed § 363(b) transaction where the record suggested the proposed use primarily benefited affiliated entities and secured lenders rather than the debtor estates whose assets were being used). The Court must evaluate benefit to MedEx and its Creditors. The Motion does not provide sufficient structure to ensure that MedEx's creditors receive the benefit of the proposed expenditure.

**H. The current posture of the case weighs against approval as filed.**

MedEx has been in bankruptcy for nearly two years. Its first Subchapter V plan was denied, and no amended plan has been confirmed. The Court recognizes that unresolved state-court litigation has complicated plan formulation. The Court does not deny the Motion simply because no confirmed plan exists. Nor does the Court suggest that MedEx has acted in bad faith by delaying a new plan while related litigation remains unresolved.

Here though, elapsed time, plan status, and the effect of the proposed transaction on a future plan are relevant under *Continental*. The proposed use would materially affect MedEx's liquidity and the direction of the case. The funds appear to constitute substantially all available liquid funds. Once spent, those funds may no longer be available for administrative expenses, creditor distributions, litigation needs, or plan funding. And the projected return is delayed and uncertain. Under those circumstances, MedEx must present more than a general business growth plan. It must show how the proposed use fits within the administration of this estate and a feasible path to reorganization. It has not done so on the current record.

**I. The Court will not adjudicate claim objections or sanctions through this Motion.**

John Logan argues that RedMed, Covenant, Turner, and M&K lack standing because their proofs of claim are allegedly false or unsupported by valid state-law claims. He relies on cases recognizing that a bankruptcy claim generally must be based on an enforceable right to payment under applicable nonbankruptcy law. See *In re Nichols*, 509 B.R. 722 (Bankr. N.D. Okla. 2014); *Resolution Trust Corp. v. McKendry (In re McKendry)*, 40 F.3d 331 (10th Cir. 1994). He also cites authority addressing stale or unenforceable claims filed in bankruptcy. See *In re Feggins*, 540 B.R. 895 (Bankr. M.D. Ala. 2015).

Those authorities do not provide a basis for the Court to resolve claim validity through this Motion. Under § 502, a filed proof of claim is deemed allowed unless a party in interest objects. See 11 U.S.C. § 502(a). Bankruptcy Rule 3007 governs claim objections. See Fed. R. Bankr. P. 3007. Requests to disallow claims, strike claims, or impose sanctions based on allegedly false proofs of claim must be brought through the proper procedural vehicle and with the notice and procedural protections required by the Code and Rules.

Thus, the Court does not decide through this contested matter whether RedMed, Covenant, Turner, or M&K ultimately hold allowed claims, whether any party has filed a false claim, or engaged in sanctionable conduct. Those issues are not properly before the Court through this Motion. The Code broadly permits "parties in interest" to appear and be heard in Chapter 11 proceedings. See 11 U.S.C. § 1109(b); *Matter of Highland Capital Mgmt., L.P.*, 74 F.4th 361, 370 (5th Cir. 2023). Whether a filed claim may later be disallowed through the claims objection process is a separate issue.

Further, parties who have filed proofs of claim are generally considered parties in interest unless and until their claims are withdrawn or disallowed. See *Matter of Xenon Anesthesia of*

*Texas, P.L.L.C.*, 698 F. App'x 793, 794 (5th Cir. 2017). The Court declines, in this contested matter, to convert a dispute over claim allowance into a collateral threshold challenge to a creditor's ability to be heard while its proof of claim remains pending on the claims register. Whether any claim should ultimately be allowed, disallowed, subordinated, or otherwise limited must be resolved, if at all, through the claims objection process, not through repeated standing challenges asserted in connection with unrelated motions.

Even if the objections were not considered, the result would be the same. Courts evaluating § 363(b) motions have recognized that standing disputes should not unnecessarily displace the Court's independent obligation to evaluate whether the debtor has satisfied § 363(b). See, e.g., *In re Condere Corp.*, 228 B.R. 615, 624-25 (Bankr. S.D. Miss. 1998) (declining to strike objection to § 363(b) motion on standing grounds where objector had acquired creditor status prior to hearing). MedEx, as the movant, bears the burden of establishing a sufficient business justification under § 363(b), and the Court has an independent obligation to determine whether estate property may be used outside the ordinary course. The Motion does not satisfy that burden.

**J. The proposed use also raises "creeping-plan" concerns.**

The Court does not hold that the Motion is an impermissible *sub rosa* plan under *In re Braniff Airways, Inc.*, 700 F.2d 935 (5th Cir. 1983). The Motion does not classify claims, solicit votes, release claims, distribute sale proceeds, or expressly dictate plan treatment in the manner condemned by the Fifth Circuit in *Braniff*.

Still, the concern is relevant. *Braniff* and its progeny recognize that § 363(b) may not be used to circumvent the protections ordinarily associated with the Chapter 11 plan process. See *Braniff*, 700 F.2d at 940; *Continental Airlines*, 780 F.2d at 1227-28 (5th Cir. 1986); *Condere*, 228 B.R. at 627-29. Although postpetition transactions outside the ordinary course may be necessary

before confirmation, courts must remain mindful that estate-defining transactions should not effectively determine the course of a reorganization without corresponding safeguards.

This Motion is not a sale motion or a financing motion. Functionally, though, it would authorize MedEx to use substantially all available liquid funds to pursue a multi-year operational restructuring of an affiliated business group before confirmation. Granting the Motion as filed could materially determine the estate's liquidity, administrative solvency, plan feasibility, and future direction. It would do so without a plan, disclosure, voting, classification, feasibility findings, best-interest analysis, cramdown protections, or other confirmation safeguards.

The Court need not decide whether the Motion crosses the *Braniff* line because the Motion fails under § 363(b) as filed. A renewed motion, if filed, should address these concerns through a more developed evidentiary record and appropriate estate-level protections. Depending on the relief sought, those protections could include narrower or phased relief, written agreements, reporting requirements, oversight mechanisms, coordination with the MedPlus Tupelo case, or integration with a proposed plan structure.

## IV. CONCLUSION

MedEx presented a plausible business rationale. MedEx is a management company, and the success of the clinics it manages may affect MedEx's revenue. The Court does not question that John Logan believes the proposed expenditures are necessary to preserve the business. Nevertheless, § 363(b) requires more than a plausible business idea. MedEx seeks to use substantially all available liquid funds for an affiliate-centered business expansion. The direct beneficiaries are separate legal entities. The projected benefit to MedEx is indirect, delayed, and insufficiently documented. The record also does not sufficiently establish the threshold predicate that the funds are property of the estate or otherwise subject to use by MedEx under § 363(b). In

addition, the record lacks the written agreements, repayment structure, collateral protection, independent support, reporting mechanisms, and plan-level context necessary to grant the Motion as filed. The Court does not, however, find that MedEx proposed the Motion in bad faith. The defect is not intent; it is proof, structure, and protection.

Because the denial is without prejudice, MedEx may file a renewed motion supported by a more developed record. Any renewed request should identify the precise funds to be used, the source and ownership of those funds, the legal basis for treating the funds as property of the estate or otherwise subject to use by MedEx under § 363(b), the entity benefited by each expenditure, the written agreements establishing MedEx's rights, the mechanism for reimbursement or compensation to MedEx, any required relief in the MedPlus Tupelo case, proposed reporting and oversight, and the effect of the proposed use on any future plan.

Accordingly, it is hereby **ORDERED, ADJUDGED, AND DECREED** that the Motion for Authority to Use Property of the Estate [Dkt. #166] is **DENIED WITHOUT PREJUDICE**.

It is further **ORDERED** that nothing in this Opinion adjudicates ownership of the funds held by Debtor's counsel; the Court holds only that the current record does not permit approval of their use under § 363(b).

It is further **ORDERED** that nothing in this Opinion adjudicates the allowance, disallowance, validity, amount, priority, or enforceability of any proof of claim.

It is further **ORDERED** that nothing in this Opinion determines whether any party has filed a false claim or engaged in sanctionable conduct.

It is further **ORDERED** that all other relief requested in connection with the Motion and related responses, objections, joinders, and replies is denied without prejudice.

##END OF ORDER##